# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# WESTERN DIVISION

| | |
|---|---|
| DAN WAGNER and<br>PHYLLIS CHEESEMAN,<br><br>    Plaintiffs,<br><br>v.<br><br>NORCOLD, INC.,<br>THETFORD CORPORATION, and<br>THE DYSON-KISSNER-MORAN<br>CORPORATION,<br><br>    Defendants. | Case No. 5:23-cv-87<br><br>**COMPLAINT**<br><br>**(JURY DEMAND)** |

COME NOW Plaintiffs Dan Wagner and Phyllis Cheeseman, by and through their attorneys, and for their causes of action against Defendants Norcold, Inc., Thetford Corporation, and The Dyson-Kissner-Moran Corporation state as follows:

## I.  INTRODUCTION

1. This action seeks to recover damages for injuries suffered by Plaintiffs Dan Wagner and Phyliss Cheeseman as the direct and proximate result of the wrongful conduct of Defendants in connection with the research, testing, design, development, manufacture, production, inspection labeling, marketing, promotion, sale, and distribution of a Norcold manufactured model 1210 series refrigerator. Defendants' negligence resulted in the destruction of Plaintiffs' property.

## II.  PARTIES

2. Plaintiff Dan Wagner is a citizen of the State of North Carolina and resides in Granville County, North Carolina. Mr. Wagner was living at the property where the fire occurred in this case.

3. Plaintiff Phyllis Cheeseman is a citizen of the State of Florida and resides in Broward County, Florida. Ms. Cheeseman is the owner of the property where the fire occurred in this case.

4. Defendant Norcold, Inc. ("Norcold") is a Delaware corporation, with its principal office at 600 S. Kuther Rd, Sidney, Ohio 45365. Defendant Norcold manufactures, among other things, refrigerators which are installed in recreational vehicles, including the recreational vehicle that contained the Norcold refrigerator which is the subject of this lawsuit. Defendant Norcold may be served with civil process through its registered agent for service, Corporation Service Company, 251 Little Falls Drive, Wilmington, New Castle County, Delaware 19808.

5. Defendant Thetford Corporation ("Thetford") is a Delaware corporation, with its principal office at 7101 Jackson Road, Ann Arbor, Michigan 48103. Defendant Thetford may be served with civil process through its registered agent for service, The Prentice-Hall Corporation System, Inc., 2900 West Road, Suite 500, East Lansing, Ingham County, Michigan 48823.

6. Defendant The Dyson-Kissner-Moran Corporation ("DKM") is a Delaware corporation, with its principal office at 2515 South Rd, Suite 5, Poughkeepsie, New York, 12601. Defendant DKM may be served with civil process through its registered agent for service, Corporation Service Company, 251 Little Falls Drive, Wilmington, New Castle County, Delaware 19808.

7. After all of Norcold's assets and stock were purchased by Thetford and DKM in or about 1997, Norcold then became a division of Thetford. Thereafter, Norcold operated as a division or wholly owned subsidiary of Thetford, and Norcold and Thetford operated as divisions or wholly owned subsidiaries of DKM.

8. Since at least 1997 until 2022, Thetford and Norcold were operated and controlled

by DKM as part of DKM's "Recreational Vehicle Group." As part of the organizational structure established by DKM, Norcold was controlled by Thetford through officers and corporate management that is joint to both entities. Thetford and Norcold's officers report directly to DKM. All profits generated by Thetford and Norcold flowed directly to DKM. DKM exercised substantial control over the distribution of profits to and between Thetford and Norcold, and further exercised substantial control over the expenditure of monies by Thetford and Norcold. At all times relevant hereto, DKM, Thetford, and Norcold were and are privy to, and share amongst themselves (and/or had access to), the same facts and information regarding the design, manufacture, sale, installation, failure, recall, and retrofit of Norcold refrigerators.

### III.   JURISDICTION & VENUE

9.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because a substantial portion of the events and omissions giving rise to this action occurred in this District, and Defendants' actions and business enterprise caused harm to Plaintiffs in this District.

### IV.   FACTUAL ALLEGATIONS

11. Plaintiff Dan Wagner lived at his mother, Plaintiff Phyllis Cheeseman's property in Granville County, North Carolina.

12. Mr. Wagner operated a shop located behind Ms. Cheeseman's property. A friend of Mr. Wagner parked his 2003 Fleetwood Discovery RV (the "RV") behind Ms. Cheeseman's house and in front of Mr. Wagner's shop.

13. The RV was equipped with a Norcold manufactured model 1210 series refrigerator

(the "Subject Refrigerator" or "Norcold Refrigerator"), serial number 13248246, which was purchased on February 26, 2011.

14. On June 3, 2011, the Subject Refrigerator was subject to Defendants' "High Temperature Sensor Recall." The recall work to install Part Number 634737, described as the "KIT-RECALL-HT SENSOR," was completed by A&M Services in Kittrell, North Carolina.

15. On November 22, 2011, the RV's owners reported to A&M Services that the Subject Refrigerator was showing a fault code "U OP," related to winterizing the Subject Refrigerator. On or about that same day, A&M Services performed the work necessary to "winterize" the Subject Refrigerator.

16. On November 28, 2011, the Subject Refrigerator was subject to Defendants' "High Temperature Sensor Recall." The recall work was performed a second time with the same part number and description as the first recall and was completed by A&M Services in Kittrell, North Carolina on December 1, 2011.

17. On Thanksgiving Day, November 24, 2022, the Subject Refrigerator caught fire in the RV, then spread to Mr. Wagner's shop -- completely destroying it and its contents.



4

18. Mr. Wagner is a veteran, expert builder of motorcycles. Not only were the contents of Mr. Wagner's shop, consisting of tools and parts accumulated for over 30+ years, and the RV destroyed, but Ms. Cheeseman's building was also destroyed. Several other customer race bikes in Mr. Wagner's shop were demolished in the fire as well.



19. The flames ignited by the Subject Refrigerator had to be extinguished by the Brassfield Volunteer Fire Department, Creedmoor Fire Department, Corinth Fire Department, and Northern Wake Fire Department.

V. **THE DEFECT IN THE NORCOLD REFRIGERATOR & THE RECALLS**

20. Plaintiffs hereby adopt and re-allege each and every paragraph of this Complaint as if fully and completely set forth at length herein.

21. Beginning in at least 1996, and continuing thereafter, Norcold designed, manufactured, assembled, and sold gas absorption refrigerators for use in recreational vehicles and boats. The gas absorption refrigerators came in various sizes, including six cubic feet (the "N6"

5

Series), eight cubic feet (the "N8" Series), and twelve cubic feet (the "1200 Series"). All of these series of refrigerators shared the same technology, which involved a process whereby a solution of ammonia, water, chromate, and hydrogen gas is heated by electricity or propane until it boils (approximately 400 degrees Fahrenheit), releasing ammonia gas. The gas circulates through a series of tubes at approximately 450 psi. As the ammonia gas is first condensed into a liquid, and then evaporated through interaction with the hydrogen gas, heat is removed from the refrigerator box, causing the temperature in the box to decrease and providing the refrigeration effect. The series of tubes is referred to as a "cooling unit" and includes the heat source (propane and electric), as well as a condenser, evaporator, absorber, and solution tank.

22. Defendants have admitted that the cooling units used on both its N6/N8 Series refrigerators and 1200 Series refrigerators contain design and/or manufacturing defects that cause fires. Defendants have instituted two (2) product safety recalls of its N6/N8 refrigerators through the National Highway Traffic Safety Administration ("NHTSA"): one in 2000 (NHTSA No. 00E-031) and one in 2002 (NHTSA No. 02E-019). Defendants have instituted five (5) separate product safety recalls of its 1200 Series refrigerators – NHTSA No. 02E-045 (2002); NHTSA No. 08E-030 (2008); NHTSA Nos. 09E-026 and 09E-027 (2009), and NHTSA No. 10E-049 (2010).

23. All of the recalls involved the same defect in the refrigerator cooling units, misleadingly described by Defendants as a "low cycle fatigue failure on thermal expansion [when the refrigerator is operated] in the AC mode." In fact, the common defect shared by all three models of gas absorption refrigerators was a propensity for the steel tubing used in the cooling units to corrode from the inside, causing thinning of the walls of the steel tubing. When combined with the stresses introduced into the tubing during the fabrication and manufacturing process, and the stresses placed on the tubing during normal operation of the refrigerators – namely, high

temperature, high pressure, and chemical interaction of corrosive cooling solution – the cooling units were prone to develop microscopic pits and cracks at and around the "boiler tube" which is the section of the cooling unit where the electric heat inputs are welded to the cooling unit and where the boiler tube is dimpled to hold an interior "percolator tube." The cracks and pits allow the highly flammable cooling solution and hydrogen gas to leak from the cooling unit in the area of the electric heaters and propane pilot light. When the solution in the cooling unit is reduced by as little as twenty percent (20%), the cooling unit can experience a "run-away heating event" that causes the steel tubing to reach temperatures in excess of 1,000 degrees Fahrenheit, resulting in fires, either by ignition of the escaping flammable gases, or by ignition of the combustible unprotected wood inside the refrigerator compartment. Defendants concede that such leaks in their gas absorption refrigerator cooling units carry the risk of "injury or death" to individuals using their products as designed and intended, and for a reasonably foreseeable purpose.

24. In addition to the failure of the cooling unit tubing of Defendants' gas absorption refrigerators, Defendants' N6, N8, and 1200 Series refrigerators' cooling units also contain further design/manufacturing defects, including, but not limited to, a "safety fuse." The safety fuse is a plug made of low melting point tin-bismuth alloy that is inserted into the end of a tube in the cooling unit. The safety fuse is designed to melt and "blow out" at relatively low temperatures (less than 300 degrees Fahrenheit), thereby depressurizing the cooling unit before it ruptures. However, the safety fuse plug operates on temperature and not on pressure, making it ineffective as a pressure relief system, *i.e.,* it does not prevent the cooling unit from rupturing due to high pressure. Further, when the safety fuse "blows out" because it is exposed to heat – as in a fire – it releases the cooling solution into the enclosed space of the refrigerator compartment at over 450 psi, creating a cloud of highly flammable ammonia and hydrogen gas, which is then ignited by any

available ignition source. The effect of this "safety" device – when operating as designed – is either to initiate a fire where none existed or make a small fire much worse. This is a common defect present in all of Defendants' N6/N8 and 1200 Series refrigerators.

25. The fires caused by Defendants' products create serious safety risks to users of Defendants' products and those nearby, including Plaintiffs, in that the flammable gases released – particularly the hydrogen – can explosively ignite and spread quickly through the refrigerator compartment and into the passenger area of the vehicle or boat. Such fires also pose a serious safety risk to any person or property in the vicinity of the recreational vehicle or boat in that such refrigerator fires are difficult to extinguish due to the escape of flammable gases under high pressure, and can expand quickly outside the RV in both vertical and horizontal jets of flame to structures, other vehicles and people nearby.

26. At all times mentioned herein, Defendants had actual knowledge of the existence of the above-described design and manufacturing defects, and of the serious safety risks owners of Defendants' gas absorption refrigerators unknowingly faced each time they used the product in a reasonably foreseeable manner, but failed and refused to modify the design of their gas absorption refrigerator cooling units, or the fabrication and manufacture of the cooling units, to eliminate the defects, until October of 2012, when they began to introduce into the marketplace – unannounced – a redesigned 1200 Series cooling unit. The fact that Defendants redesigned the 1200 Series cooling unit was never disclosed to existing owners of Norcold 1200 Series refrigerators, including Plaintiffs, nor was the redesigned cooling unit offered to current owners, including Plaintiffs, through an expansion of one of the many NHTSA recalls of the product initiated by Defendants.

27. Rather, since 1996, Defendants made a series of efforts to address the propensity

8
Case 5:23-cv-00087-D-RJ    Document 1    Filed 02/21/23    Page 8 of 18

for their gas absorption refrigerators to catch on fire by retrofitting their refrigerators with various devices to cut off electric power before they overheat. These devices have included an algorithm chip installed into the electronic controls of 1200 Series refrigerators manufactured between January 2003 and September 2005; a thermal safety switch (TSS) installed in new production 1200 Series refrigerators manufactured between September 2005 and October 2010, and retrofitted in pre-2003 refrigerators pursuant to NHTSA recalls 02E-045, 08E-030, 09E-026, and 09E-027; and, a high temperature sensor (HTS), installed in new 1200 Series production refrigerators from October 2010, and retrofitted to all 1200 Series refrigerators manufactured between 1996 and October 2010 pursuant to NHTSA recall 10E-049. None of the retrofits worked because none of the retrofits addressed or remedied the underlying defective boiler tube and safety plug designs that were the cause of the cooling unit failures and fires in the first place. In fact, Norcold's own incident report documents show that fires involving Norcold refrigerators are still occurring even though recall work has been performed, including recall work associated with the High Temperature Sensor (HTS) installation.

28.     Over the past fifteen (15) years, Norcold gas absorption refrigerators have continued to cause fires, resulting in over 3,000 reported fires, in excess of $132,000,000.00 in property damage and personal injury claims, and at least one death, as of March 19, 2014. Defendants continue to receive new fire claims, caused by the same defects described above, at the rate of three to five per week as of August of 2014.

29.     In 2016, Norcold's corporate representative admitted in a deposition that a design that allows for corrosion and leaking of flammable gas is defective:[1]

---

[1] Deposition of Eric W. Klein at page 40, line 20 to page 41, line 4, ttaken in Case No. 1:16-cv-7130LO-IDD, *Michael Runnels et al vs. Norcold, Inc. et al*; in the United States District Court for the Eastern District of Virginia, Alexandria Division.

9

```
20       Q.   Okay, it's a straightforward
21  question.  Do you agree that the design of a
22  refrigerator that allows for the corrosion and
23  leaking of flammable gas in family RVs to be
24  imperfect?
25            A.   Yes.
1        Q.   Faulty?
2        A.   Yes.
3        Q.   Defective?
4        A.   Yes.
```

30.     Norcold's corporate representative also admitted that refrigerators that catch on fire are unreasonably dangerous and that Norcold has a duty to design and manufacture safe refrigerators:[2]

```
5        Q.   You agree that refrigerators that
6   catch on fire in family RVs are not safe and,
7   in fact, unreasonably dangerous, correct?
10            THE WITNESS:  Yes.
19       Q.   I just want to know if you think
20  that your company has a duty to design and
21  manufacture refrigerators that are safe in
22  family RVs and don't kill people?
24            THE WITNESS:  Yes.
```

31.     Norcold also admitted in 2016 that the leaking of hydrogen gas from the Refrigerator cooling system is extremely dangerous and that Norcold had done nothing to prevent the corrosion and leaking of highly flammable gas:[3]

---

[2] Deposition of Eric W. Klein at page 141, line 5 to line 10; line 19 to line 24.
[3] Deposition of Eric W. Klein at page 50, line 11 to line 22.

> 11    Q.   Okay. Mr. Klein, isn't it true
> 12  that despite knowing about the corrosion and
> 13  leaking of flammable gas since 1996, which you
> 14  agreed to earlier, and despite Norcold issuing
> 15  seven recalls, the latest being the 2010 recall
> 16  we talked about, Norcold has never issued a
> 17  recall that stops the corrosion and leaking of
> 18  highly flammable gas in its refrigerators?
>
> 21          THE WITNESS:  The answer to your
> 22  question is yes.

32. On information and belief, Norcold has to the present day done nothing to prevent the corrosion of the Refrigerator's tubing and leaking of highly flammable hydrogen gas.

33. As an example of Norcold's indifference, the head of engineering at Norcold presented a solution to Norcold's upper management in 2010 involving increasing the wall thickness of the tubing. Norcold's upper management rejected the proposal. In addition, a proposal was made to Norcold to use a stronger metal for its tubing such as stainless steel, which was also rejected.

34. Since at least 2000, Defendants had actual knowledge of the design and manufacturing defects in their gas absorption refrigerators that created a propensity for the products to cause fires when used in a reasonably foreseeable manner. As of February 3, 2014, Defendants had actual knowledge of over 3,000 fire claims involving their N6, N8, and 1200 Series gas absorption refrigerators, including at least 2,400 fires involving 1200 Series refrigerators. As of at least February 3, 2014, Defendants had actual knowledge that their campaigns to retrofit 1200 Series refrigerators with external devices to cut off electric power to the units before they caught fire was a failure, and that their gas absorption refrigerators continued to cause fires,

notwithstanding the retrofits.

### VI. DEFENDANTS' CONDUCT MERITS PUNITIVE DAMAGES

35. Plaintiffs hereby adopt and re-allege each and every paragraph of this Complaint as if fully and completely set forth at length herein.

36. The foregoing conducts – both acts and omissions – of the Defendants with regard to both the initial design of the defective Norcold Refrigerator, defective and ineffective recalls, failure to warn, the length of time this went on, and so forth constitute willful or wanton conduct on the part of all of the Defendants. *See* N.C.G.S. §1D-1, *et seq.* Individually and in concert, they acted with conscious and intentional disregard of and indifference to the rights and safety of all of their customers and those third-parties who would come into contact with or be damaged or injured by their defective Norcold Refrigerators. Individually and in concert, the Defendants knew or should have known that the defective Norcold Refrigerators were reasonably likely to cause fires that result in injury, damage, or other harms. The Defendants in this case collectively participated in or condoned the willful and wanton conduct of each other that caused or contributed to the damages in this case.

37. The maximum amount of punitive damage should be awarded in this case when the jury considers the purposes of punitive damages and evidence of the following: (a) the reprehensibility of the Defendants' motives and conduct; (b) the likelihood of serious harm due to the defective Norcold Refrigerator and the design and defective and ineffective recalls; (c) the degree of Defendants' awareness of the probable consequences of their conduct; (d) the duration of the Defendants' conduct; (e) the actual damages suffered by Plaintiffs; (f) the concealment of the truth of the defective Norcold Refrigerator and then further the concealment of the defective and ineffective recalls and the fact that others had been harmed by these defective Refrigerators

12
Case 5:23-cv-00087-D-RJ   Document 1   Filed 02/21/23   Page 12 of 18

and ineffective recalls; (g) the existence and frequency of the similar conduct in the past by these Defendants concerning both this same 1200 Series refrigerator but also the other series with the same design defect which caused the same types of fires and damages; (h) the amount by which Defendants profited from their concealment and failure to remedy their defectively designed Norcold Refrigerators; and (i) the Defendants' ability to pay punitive damages as evidenced by their revenues and net worth. *See* N.C.G.S. §1D-35.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Defective Design

38. Plaintiffs hereby adopt and re-allege each and every paragraph of this Complaint as if fully and completely set forth at length herein.

39. Plaintiffs bring a products liability action as that is defined in N.C.G.S. §99B-1 as: "any action brought for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, **construction**, **design**, **formulation**, **development of standards**, preparation, processing, assembly, **testing**, listing, certifying, **warning**, **instructing**, **marketing**, **selling**, **advertising**, packaging, or labeling of any product." (Emphasis added.)

40. Defendants designed, engineered, manufactured, assembled, inspected, tested, marketed, advertised, distributed, and sold the Norcold Refrigerator <u>and</u> the Recall Repair Kits.

41. At the time of the manufacture of the Norcold Refrigerator, Defendants acted unreasonably in designing it which was a proximate cause of the harm for which damages are sought, that is, the total destruction of the property described above. *See* N.C.G.S. §99B-6(a).

42. Further, at the time the Norcold Refrigerator left the control of Defendants, Defendants unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design that could have been reasonably adopted and would have prevented or

13

Case 5:23-cv-00087-D-RJ   Document 1   Filed 02/21/23   Page 13 of 18

substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the Norcold Refrigerator. *See* N.C.G.S. §99B-6(a)(1).

43. In the alternative, or in addition to the foregoing, at the time the Norcold Refrigerator left the control of Defendants, the design was so unreasonable that a reasonable person, aware of the relevant facts – the nature of the defect and the harm that its manifestation could, would, or was likely to cause – would not use a refrigerator of this design. *See* N.C.G.S. §99B-6(a)(2).

44. In addition, not only was the original design of the Norcold Refrigerator defective under the statute as described above, but so were the Recall Repair Kits. At the time the Recall Repair Kits were manufactured, Defendants acted unreasonably in designing them which was a proximate cause of the harm for which damages are sought, that is, the total destruction of the property described above. *See* N.C.G.S. §99B-6(a).

45. Further, at the time the Recall Repair Kits left the control of Defendants, Defendants unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design that could have been reasonably adopted and would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the Norcold Refrigerator after it was repaired with the Recall Repair Kit. *See* N.C.G.S. §99B-6(a)(1).

46. Defendants acted unreasonably under N.C.G.S. §99B-6(a) when looking at the following factors, among others: the nature and magnitude of the risks of harm associated with the design of the Norcold Refrigerator in light of the intended and reasonably foreseeable uses of it. *See* N.C.G.S. §99B-6(b)(1). For example, families are often in RVs and sleep in them. A refrigerator, including one that has been "repaired" pursuant to a recall, that is (still) a ticking time

bomb due to its design, which can go off at any time including when people are sleeping in an RV that combusts so rapidly, is a risk of the greatest magnitude in light of how what this product is and how it is used.

47. Defendants acted unreasonably under N.C.G.S. §99B-6(a) when looking at the following factors, among others: the likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm. *See* N.C.G.S. §99B-6(b)(2). There were no warnings associated with this inherent defect. Perhaps even worse, there were no warnings that the recalls were ineffective. This gave consumers a false sense of security thinking that since the repair work was completed, the defect was eliminated. It was not. And, while Defendants knew this, consumers did not. Nor did those who would house or allow RVs equipped with Norcold Refrigerators realize the risk they were taking on.

48. Defendants acted unreasonably under N.C.G.S. §99B-6(a) when looking at the following factors, among others: the utility of the product, including performance, safety, and other advantages associated with the design. *See* N.C.G.S. §99B-6(b)(5). There is no advantage over this particular design than others that are safer, perform just as well, and make other RV refrigerators just as useful.

49. Defendants acted unreasonably under N.C.G.S. §99B-6(a) when looking at the following factors, among others: the technical, economic, and practical feasibility of using an alternative design at the time of manufacture. *See* N.C.G.S. §99B-6(b)(6). As Plaintiffs' experts will show, there were technical, economic, and practically feasible alternative designs to the Norcold Refrigerator at the time of its manufacture which Defendants knew of, but chose not to use. The same is true of the recall.

50. Defendants acted unreasonably under N.C.G.S. §99B-6(a) when looking at the

15

Case 5:23-cv-00087-D-RJ     Document 1     Filed 02/21/23     Page 15 of 18

following factors, among others: the nature and magnitude of any foreseeable risks associated with the alternative design. *See* N.C.G.S. §99B-6(b)(7). There are no risks associated with the alternative design to the Norcold Refrigerator that come anywhere near the risks of injury, property damage, and death that come with the current design of the Norcold Refrigerator, including when it has been "repaired" pursuant to Defendants' recall.

51. As a direct and proximate result of the defective or unreasonably dangerous condition of the Norcold Refrigerator with or without the recall work performed, Plaintiffs incurred damage to structures, vehicles, and/or personal property.

## SECOND CAUSE OF ACTION
## NEGLIGENCE

52. Plaintiffs hereby adopt and re-allege each and every paragraph of this Complaint as if fully and completely set forth at length herein.

53. Defendants owed a duty to those who would foreseeably be injured by or suffer property damage due to their products, including the Plaintiffs, to use reasonable care to design, engineer, manufacture, assemble, inspect, test, market, advertise, distribute, and/or sell the Norcold Refrigerator free from any defect which might start a fire.

54. Defendants, in breach of their duties, failed to use ordinary care to design, engineer, manufacture, assemble, inspect, test, market, advertise, distribute, and/or sell the Norcold Refrigerator so as to make it Refrigerator reasonably safe.

55. The Norcold Refrigerator was defective at the time it left Defendants' control, the defect was the result of Defendants' negligence, and the defect proximately caused Plaintiffs' damages. The same is true of the recalls.

56. The Norcold Refrigerator at issue in this case was put to its ordinary use and it caught fire and destroyed the property described. A product defect may be inferred from evidence

of the product's "malfunction" during its ordinary use.

57. There is evidence in this case – as there has been for decades – that Defendants designed the Norcold Refrigerators in this series (and others) with the specific defect in the design and function of the boiler tube as set forth above.

58. As a direct and proximate result of the defective or unreasonably dangerous condition of the Norcold Refrigerator, even after it had been "repaired" pursuant to Defendants' recalls, Plaintiffs incurred damage to structures, vehicles, and/or personal property.

## JURY DEMAND

Plaintiffs request a trial by jury on all claims herein so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that Defendants be cited to appear and answer herein and that upon final trial, Plaintiffs have and recover the following:

1. Judgment against Defendants for all compensatory damages resulting from the fire;

2. Judgment against Defendants for punitive damages;

3. Court costs; and

4. Such other and further relief as the Court may deem just and proper.

Respectfully submitted this 21st day of February, 2023,

> **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
>
> */s/ Patrick M. Wallace*
> Patrick M. Wallace
> N.C. Bar No. 48138
> 900 W. Morgan Street
> Raleigh, North Carolina 27603
> Telephone: (919) 600-5000
> Facsimile: (919) 600-5035
> pwallace@milberg.com
>
> *Local Civil Rule 83.1(d) Counsel for Plaintiffs*

Bradley L. Leger*
Rodney K. Castille*
**LEGER KETCHUM & COHOON, PLLC**
10077 Grogan's Mill Road, Suite 325 The Woodlands, Texas 77380
Tel: (832) 764-7200
Fax: (832) 764-7211
bleger@lkclawfirm.com
rcastille@lkclawfirm.com

*Attorneys for Plaintiffs*

*\* To be Admitted by Special Appearance*